**PAX LEGAL, INC.**
By: Neil M. Hilkert, Esq.
Lida L. Bonner, Esq.
Attorney I.D. Nos. 44696 & 83985
600 W. Germantown Ave.
Suite # 400
Plymouth Meeting, PA 19462
(610) 940-1663 TEL
*neil@paxlegalinc.com*
*lida@paxlegalinc.com*

*Counsel for Plaintiff,*
Devon Murray

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

**THE HONORABLE DISTRICT JUDGE GAIL A. WEILHEIMER
THE HONORABLE MAGISTRATE JUDGE JOSE R. ARTEAGA**

| | | |
|---|---|---|
| **DEVON MURRAY** | : | **DOCKET NO: 2:24-cv-00273-MRP** |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **VERIZON WIRELESS, LLC** | : | |
| | : | |
| *Defendant* | : | |

**PLAINTIFF, DEVON MURRAY'S, MEMORANDUM OF LAW IN SUPPORT OF HIS
RESPONSE IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT FILED
BY DEFENDANT, VERIZON WIRELESS LLC**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES

PRELIMINARY STATEMENT

FACTUAL BACKGROUND

LEGAL STANDARD

ARGUMENT

    A. There is an issue of material fact about whether the Plaintiff uttered a "racial slur"

    B. Plaintiff can make a *prima facie* case for race discrimination and retaliation

        a. Plaintiff can make a *prima facie* case for race discrimination

        b. Plaintiff can make a *prima facie* case for retaliation

        c. Defendant did not terminate the employment of the Plaintiff for a legitimate, non-discriminatory, non-retaliatory reason

        d. Plaintiff can show that Defendant's stated reason for terminating Plaintiff's employment was pretextual

    C. Plaintiff has established a claim for wrongful termination

CONCLUSION

## TABLE OF AUTHORITIES

*Anderson et. al. v Liberty Lobby, Inc. et. al*., 477 U.S. 242 at 248; 106 S. Ct. 2505;
91 L. Ed. 2d 202 at 211-212; 54 U.S.L.W. 4755; 4 Fed. R. Serv. 3d (Callaghan)
1041; 12 Media L. Rep. 2297; Disposition: 241 U.S. App. D.C. 246, 746 F.2d
1563, vacated and remanded

*Aman v. Cort Furniture Rental Corp*., 85 F.3d 1074, 1080 (3d. Cir. 1996)

*Bostock v. Clayton County*, 590 U.S. 644, 681 (2020)

*EEOC v. Abercrombie & Fitch Stores, Inc*., 575 U.S. 768, 771 (2015)

*Fuentes v. Perskie*, 32 F.3d 759, 765 (1994)

*Stockton v. Green, Tweed & Co., Inc*., 2020 U.S. Dist. LEXIS 137364

EEOC Guidance: Race Discrimination (https://www.eeoc.com/guidance/discrimination/race-discrimination/)

Fed. R. Civ. P. Rule 56(a)

Plaintiff's Complaint

Plaintiff's Partial Motion for Summary Judgment

Defendant's Memorandum in Support of its' Motion for Summary Judgment

Joint Statement of Undisputed Facts filed July 31, 2025

## PRELIMINARY STATEMENT

Plaintiff, Devon Murray ("Plaintiff" or "Devon"), by and through his attorneys, PAX Legal, Inc., hereby submits the following Memorandum of Law in support of his Response in Opposition to the Motion for Summary Judgment filed by the Defendant, Verizon Wireless LLC, (the "Defendant" or "Wireless"), and in support states the following:

## I.    FACTUAL BACKGROUND

1.    Plaintiff incorporates by reference all his forgoing Pleadings, Motions and Responses filed in this matter as though the same were fully included below.

2.    Plaintiff is an African American male and a member of a protected class. *See*, Joint Statement of Undisputed Facts, paragraph 2.

3.    Plaintiff was hired by Defendant, Verizon Wireless, in September of 2017. *See*, Joint Statement of Undisputed Facts, paragraph 3.

4.    Plaintiff was hired as a Solutions Specialist.  *See*, Joint Statement of Undisputed Facts, paragraph 3.

5.    Plaintiff was to be promoted in the summer of 2023.  *See* Exhibit 6 of Defendant's Memorandum of Law, page 19, lines 17-20 and page 24, lines 11-13.

6.    Plaintiff was to be promoted to Assistant Manager.  *See*, Exhibit 6 of Defendant's Memorandum of Law, page 24, lines 11-13.

7.    As a result of the incident on June 1, 2023, the Plaintiff was told that he would likely be deemed ineligible to be promoted.  *See*, Joint Statement of Undisputed Facts, paragraph 20.

8.    Defendant has a published Code of Conduct.  *See*, Joint Statement of Undisputed Facts, paragraph 7.

9.     The published Code of Conduct **does not** preclude the use of the "n word."  *See*, Exhibit 2 and Exhibit 6 of Defendant's Memorandum of Law, page 71, lines 18-24 and page 72, lines 1-5 and Exhibit 3 of Defendant's Memorandum of Law, page 35, lines 14-25 and page 36, lines 1-3.

10.     The Plaintiff's employment was terminated on July 12, 2023 for having uttered "n word".  *See*, Joint Statement of Undisputed Facts, paragraph 25.

11.     The Defendant's Code of Conduct does not define "racial slur".  *See* Exhibit 2 of and Exhibit 3 of Defendant's Memorandum of Law, page 33, lines  11-23.

12.     Additionally, there is no prohibition of the use of a "racial slur" in Defendant's Code of Conduct.  *See*, Exhibit 2 of Defendant's Memorandum of Law page 9.

13.     The Plaintiff has always maintained, and testimony from those employees present in the store at the time of the incident have supported the Plaintiff's averment, that the Plaintiff uttered the word to himself.  *See*, Defendant's Memorandum of Law Exhibit 5 and Exhibit 6 , page 70, lines 5-9.

14.     The Defendant did not thoroughly investigate the Plaintiff's utterance of the "n word" in the context of how and when it was uttered. The Plaintiff has always maintained that he uttered the word under his breath and to himself.  *See* Exhibit 3 of Defendant's Memorandum of Law, page 22, lines 19-25, page 23, lines 5-10 and page 49, lines 1-25.

15.     The record cited by the Defendant confirms that a thorough investigation of Plaintiff's utterance, its context and the incident with employee Alec was never completed.  *See* Exhibit 3 of Defendant's Memorandum of Law, page 22, lines 19-25, page 23, lines 5-10 and page 49, lines 1-25.

16.    Of the four employees not involved in the argument but were interviewed about the incident, only Tina, the store manager, claims to have heard the Plaintiff utter the word. *See*, Defendant's Memorandum of Law, Exhibit 5, pages 8, 10 and 11.

17.    The first interviews following the incident occurred on June 1, 2023, and the interviews were with Plaintiff and Alec Smilowski, the Caucasian employee who participated in the argument with the Plaintiff on that date. *See*, Exhibit 5 of Defendant's Memorandum of Law, page 1.

18.    These interviews reference only the incident, and by reference it is clear that as of June 1, 2023, the incident was limited to only the argument. *See*, Exhibit 5 of Defendant's Memorandum of Law, page 1.

19.    Ms. LaRusso solely conducted these interviews. *See*, Exhibit 5 of Defendant's Memorandum of Law, page 1.

20.    On June 6, 2023, Ms. LaRusso and Mr. Arena interviewed the Plaintiff. *See* Exhibit 5 of Defendant's Memorandum of Law, page 2.

21.    On June 6, 2023, Ms. LaRusso and Mr. Arena interviewed Mr. Smilowski. *See*, Exhibit 5 of Defendant's Memorandum of Law, page 4.

22.    Mr. Smilowski was not investigated, placed on suspension, or disciplined due to his participation in the argument. *See*, Exhibit 5 of Defendant's Memorandum of Law, and Exhibit 3 of Defendant's Memorandum of Law, page 28, lines 4-11.

23.    In fact, Mr. Smilowski was referred to EAP as a result of the argument, instead of being disciplined. *See*, Exhibit 5 of Defendant's Memorandum of Law, page 7.

24.    On June 7, 2023, the Plaintiff reported to Mr. Arena that he believed that the actions taken against him as a result of the June 1, 2023 incident were unfair, and that he did not

believe he violated the Defendant's Code of Conduct.  *See*, Exhibit 5 of Defendant's
Memorandum of Law, page 5.

25.     On June 8, 2023, Blake Cohen was interviewed about the incident, after he
initiated a call to Ms. LaRusso.  *See*, Exhibit 5 of Defendant's Memorandum of Law, pages 7-9.

26.     Mr. Cohen's testimony was that this was not the first time that Alec had been
involved in an incident and that the incident was not the Plaintiff's fault.  *See*, Exhibit 5 of
Defendant's Memorandum of Law, page 9.

27.      Specifically, Ms. LaRusso reported that Mr. Cohen stated "Devon is more
innocent than guilty in the situation - sucks that Alec has done this multiple times and Devon has
never done anything like this before. Everyone has seen an Alec outbreak. Devon is deserving of
the position."  *See*, Exhibit 5 of Defendant's Memorandum of Law, page 9.

28.     As a result of this discussion, Ms. LaRusso stated that "Brittany LaRusso spoke
with Kevin Arena, District Manager after the call to inform him of the conversation and concerns
that Blake brought to my attention. Kevin was going to follow up with Alec."  *See*, Exhibit 5 of
Defendant's Memorandum of Law, page 9.

29.     Mr. Smilowski had a history of interactions with other employees.  *See*, Exhibit 6
of Defendant's Memorandum of Law, specifically page 34, lines 15-24, page 35, lines 1-24, and
page 36, lines 1-2.

30.     Mr. Arena was not able to recall whether he ever took any action concerning to
Mr. Smilowski's participation in the situation that occurred on June 1, 2023.  *See*, Exhibit 6 of
Defendant's Memorandum of Law, page 47, lines 7-24, page 48, lines 1-20, page 56, lines 21-24
and page 57, lines 1-10.

31.     Ms. LaRusso acknowledged that she never investigated Mr. Smilowski and he was never disciplined for the June 1, 2023 incident.  *See* Exhibit 3 of Defendant's Memorandum of Law, page 28, lines 4-11.

32.     Mr. Smilowski was never disciplined even after the reports made by Blake Cohen to Ms. LaRusso concerning Mr. Smilowski's past behavior with other employees.  *See*, Exhibit 5 of Defendant's Memorandum of Law, page 9.

33.     Additionally, Mary, one of the two other employees who witnessed the incident, reported that "she was concerned because she is feeling like after this incident it's a little uncomfortable to be around Alec." *See*, Exhibit 5 of Defendant's Memorandum of Law, page 10.

34.     Ms. LaRusso's report also states that Mr. Cohen called because "Blake is concerned about other smaller incidents involving Alec."  *See*, Exhibit 5 of Defendant's Memorandum of Law, page 7.

35.     The report also includes statements from Mr. Cohen to Ms. LaRusso that "[T]his is Alec's doing and starting the argument in the conversation."  *See*, Exhibit 5 of Defendant's Memorandum of Law, page 7.

36.     Finally, Ms. LaRusso's report states that Sejel Patel told Ms. LaRusso that "Devon does not say anything to hurt anyone's feelings on purpose. Alec gets frustrated and upset with everyone."  *See*, Exhibit 5 of Defendant's Memorandum of Law, page 11.

37.     Mr. Smilowski, who is white, was not investigated or disciplined.  *See* Exhibit 3 of Defendant's Memorandum of Law, page 28, lines 4-11.

38.     The Plaintiff was investigated, placed in "bad standing" with the company, and ultimately terminated. *See*, Joint Statement of Facts, paragraphs 14-21 and 25.

39.     On June 29, 2023, Ms. LaRusso and Mr. Arena made the decision to  have Plaintiff's employment terminated.  *See*, Exhibit 3 of Defendant's Memorandum of Law, page 33, lines 16-24, page 34, lines 1-3 and page 56, lines 5-10.

40.     The Plaintiff's employment was not terminated until July 12, 2023.  *See*, Joint Statement of Undisputed Facts, paragraph 25.

41.     Mr. Smilowski's employment was not affected by the argument with Plaintiff. *See* Exhibit 3 of Defendant's Memorandum of Law, page 28, lines 4-11.

42.     Mr. Cohen, a Caucasian male was ultimately promoted to Assistant Manager, the position that the Plaintiff was to receive prior to the June 1, 2023 incident.  *See*, Exhibit 6 of Defendant's Memorandum of Law, page 59, lines 1-4.

## II. <u>LEGAL STANDARD</u>

Summary Judgment is appropriate when, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. Rule 56(a).  The Supreme Court, in *Anderson et. al. v Liberty Lobby, Inc. et. al.,* sets forth the requirements for determining a Motion for Summary Judgment.  *Anderson et. al. v Liberty Lobby, Inc. et. al.*, 477 U.S. 242 at 248; 106 S. Ct. 2505; 91 L. Ed. 2d 202 at 211-212; 54 U.S.L.W. 4755; 4 Fed. R. Serv. 3d (Callaghan) 1041; 12 Media L. Rep. 2297; Disposition: 241 U.S. App. D.C. 246, 746 F.2d 1563, vacated and remanded.

Specifically, the Court directed that "summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson et. al. v Liberty Lobby, Inc. et. al*., 477 U.S. 242 at 248; 106 S. Ct. 2505; 91 L. Ed. 2d 202 at 211-212; 54 U.S.L.W. 4755; 4 Fed. R. Serv. 3d (Callaghan) 1041; 12 Media L. Rep. 2297; Disposition: 241 U.S. App. D.C. 246, 746 F.2d 1563,

vacated and remanded. The Court also explained: "[W]e observed further that "[it] is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." 391 U.S., at 288-289." *Id.*

Finally, the Third Circuit has clearly stated that "[W]e have held repeatedly that the party moving for summary judgment under Fed. R. Civ. P. 56(c) bears the burden of demonstrating the absence of any genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir. 1987). This burden remains with "the moving party regardless of which party would have the burden of persuasion at trial." Chipollini, 814 F.2d at 896." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d. Cir. 1996). The Supreme Court has clearly stated that "Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, prohibits two categories of employment practices. It is unlawful for an employer: "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)." *EEOC v. Abercrombie & Fitch Stores, Inc*., 575 U.S. 768, 771 (2015).

## IV. ARGUMENT

**A.     There is a genuine dispute as to whether Plaintiff uttered a "racial slur".**

The Plaintiff has pled three Counts against the Defendant, Verizon Wireless LLC. *See*, Plaintiff's Complaint. The three counts are: Count I, Violation of the PHRA; Count II, Violation of Title VII;  Count III, Wrongful Termination. *See*, Plaintiff's Complaint.  The Defendant's Motion seeks Summary Judgment on all three (3) causes of action pled in the Plaintiff's Complaint.

Defendant has a published Code of Conduct.  *See*, Joint Statement of Undisputed Facts, paragraph 7.  The published Code of Conduct does not prohibit the use of the "n word."  *See*, Exhibit 2 of Defendant's Memorandum of Law and Exhibit 6 of Defendant's Memorandum of Law, page 71, lines 18-24 and page 72, lines 1-5.  Even though the "n" word is not prohibited the Defendant fired the Plaintiff for his use of the "n word."  *See*, Joint Statement of Undisputed Facts, paragraph 25.

The Defendant in their Motion for Summary Judgment, interchangeably uses the "n word" and the term "racial slur."  *See*, Defendant's Memorandum of Law, generally, and specifically paragraphs 13, 19, 37,  and page 16.  However, there is no prohibition for using a racial slur in Verizon's Code of Conduct.  *See*, Exhibit 2 of Defendant's Memorandum of Law, generally, and page 9, identified as Bates stamp DEF0107.  There is also no prohibition of the use of the "n word" in Verizon's Code of Conduct.  *See*, Exhibit 2 of Defendant's Memorandum of Law, page 9.  Instead, Verizon's Code of Conduct states only that "[O]ther forms of harassment may include racist comments, ethnic slurs, religious stereotypes, or homophobic jokes."  *See*, Exhibit 2 of Defendant's Memorandum of Law, page 9.  Verizon's Code of Conduct also states that "[W]e do not tolerate such behavior."  *See*, Exhibit 2 of Defendant's Memorandum of Law, page

10. The Verizon Code of Conduct is vague at best concerning the definition of harassment and what the punishment will be should an employee be found to have engaged in a form of harassment. *See*, Exhibit 2 of Defendant's Motion for Summary Judgment, pages 9-10.

The EEOC provides guidance to employers in identifying the types of harassment that violate the law, and state specifically in their Guidance: Race Discrimination that "[H]arassment on the basis of race and/or color violates Title VII. Ethnic slurs, racial "jokes," offensive or derogatory comments, or other verbal or physical conduct based on an individual's race/color constitutes unlawful harassment ***if the conduct creates an intimidating, hostile, or offensive working environment or interferes with the individual's work performance***." EEOC Guidance: Race Discrimination (https://www.eeoc.com/guidance/discrimination/race-discrimination/).  The Plaintiff's utterance of the "n word" under his breath and to himself was not determined by the Defendant to have created an intimidating, hostile or offensive working environment, based on the testimony of the Defendant's witnesses, specifically Brittany LaRusso.  *See,* Exhibit 3 of Defendant's Memorandum of Law in support of its' Motion for Summary Judgment, specifically page 45, lines 7-13.  Additionally, the only individuals present in the store on June 1, 2023 who reported an employee creating an offensive working environment were Mary and Blake.  However, the reports pertained to **<u>Alec</u>** who had created the offensive working environment, not the Plaintiff.  *See*, Exhibit 2 of Defendant's Memorandum of law, pages 7 and 10.

Further, the Plaintiff's utterance of the "n word" under his breath and to himself cannot be found to interfere with the Plaintiff's work environment because the Plaintiff was permitted to work unrestricted for six weeks after his use of the "n word".  *See*, Joint Statement of Undisputed Facts, paragraph 25.  The decision to terminate the Plaintiff's employment was not made until June 29, 2023.  *See*, Exhibit 3 of Defendant's Memorandum of Law, page 33, lines 16-24, page

34, lines 1-3 and page 56, lines 5-10.  Additionally, the definition of "racial slur" is "[A] racist term **used against another person**."  (*emphasis added*) YourDictionary.com.

For the Plaintiff's use of the "n word" to be defined as a racial slur, which is not precluded by the Defendant's Code of Conduct, the Plaintiff would have had to use the "n word" against another, not utter the word to himself and about himself. As stated previously, the Plaintiff was fired solely for the **use** of a specific word, the "n word," which was not prohibited by the Verizon Code of Conduct.  *See*, Exhibit 2 of Defendant's Memorandum of Law, Exhibit 3 of Defendant's Memorandum of Law, page 35, lines 14-25 and page 36, lines 1-3, Exhibit 6 of Defendant's Memorandum of Law, page 71, lines 18-24 and page 72, lines 1-5 and Joint Statement of Undisputed Facts, paragraph 25.  Since the Defendant clearly states that the Plaintiff was fired for the use of a "racial slur," which is not defined in Verizon's Code of Conduct nor prohibited by the Verizon Code of Conduct, there is a genuine dispute as to the material fact of whether the Plaintiff uttered a "racial slur".  *See*, Exhibit 2 of Defendant's Memorandum of Law and Exhibit 3 of Defendant's Memorandum of Law, page 33, lines 11-23.

Because Verizon's Code of Conduct does not define the term "racial slur", there is a genuine issue of material fact of whether or not the utterance of a "racial slur" is a violation of Verizon's Code of Conduct.  *See*, Exhibit 2 of Defendant's Memorandum of Law and Exhibit 3 of Defendant's Memorandum of Law, page 33, lines  11-23.  As the Defendant clearly states that the Plaintiff was fired for the use of the "n word" which is not defined in Verizon's Code of Conduct and is likewise not precluded by the Verizon Code of Conduct, there is a dispute as to the material fact of whether the Plaintiff's utterance of the "n word" is a violation of Verizon's Code of Conduct.

**B.    Plaintiff's evidence proves a *prima facie* case for race discrimination and retaliation.**

**a.  Plaintiff can make a *prima facie* case for race discrimination.**

The Defendant claims that the Plaintiff is unable to prove a *prima facie* case for discrimination because the Plaintiff cannot point to "any comparators **or circumstances** that would provide an inference of discrimination."  (*emphasis added*) *See*, Defendant's Memorandum of Law, page 12.[1]  The Defendant argues that because Plaintiff provides no comparators that Plaintiff failed to prove a *prima facie* case.  Defendants argument fails because the comparator is not the only element the Court is to consider.  The Supreme Court has clearly stated that "Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, prohibits two categories of employment practices. It is unlawful for an employer: "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or *otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin*." 42 U.S.C. §2000e-2(a)." (*emphasis added*) *EEOC v. Abercrombie & Fitch Stores, Inc*., 575 U.S. 768, 771 (2015).  An

---

[1] The Plaintiff  actually has two sets of comparators which has been pled here. While the Defendant states that only individuals of the Plaintiff's protected class were given better treatment than the Plaintiff, there is no documentation provided by the Defendant for any other Verizon regions except the Atlantic North area, an area that the Defendant did not identify when responding to Plaintiff's discovery requests.  Plaintiff requested information from all of the Defendant's wireless stores.  Further, several individuals identified in Exhibit 7 of Defendant's Memorandum of Law do not appear in the detailed Confidential Documentation submitted by the Defendant, thus leaving the possibility open that perhaps individuals not part of Plaintiff's protected class were permitted to resign in lieu of disciplinary action.

employee policy that might appear to be neutral, could in fact be discriminatory if the impact to a protected class was disparate from the impact felt by non-protected classes. *Id.*

The Supreme Court in *Bostock v. Clayton County*, 590 U.S. 644 (2020), held that the review of actions that are alleged to be discriminatory is to be reviewed in terms of the actions taken against the individual claiming discrimination, not reviewed in light of the treatment of the group as a whole. *Bostock v. Clayton County*, 590 U.S. 644 (2020). Specifically, in the instant matter, the Defendant states that while they treated other members of the Plaintiff's protected class better than they treated the Plaintiff, those actions prove that the Defendant does not discriminate against members of Plaintiff's protected class as a group. *See*, Defendant's Memorandum of Law, paragraphs 53-58. Further, the Defendant states that as the Plaintiff, who was provided only termination documentation from the Atlantic North Region as a Confidential Document, failed to show that any white employees in that region did not receive better treatment when using the "n word" than the Plaintiff did, that the Plaintiff's claims must fail. *See*, Defendant's Memorandum of Law, paragraphs 53-58 and Joint Statement of Undisputed Facts, paragraphs 27-29.

To the contrary, the Supreme Court has held with respect to Title VII cases that "a rule that appears evenhanded at the group level can prove discriminatory at the level of individuals. . . . **"[t]he statute's focus on the individual is unambiguous**." (*emphasis added*) *Bostock v. Clayton County*, 590 U.S. 644, 663 (2020). Further, the Court has also concluded that a claim of treating all individuals equally cannot serve as a defense to a claim of violation of Title VII because the failure to take into account the characteristics of the individual employees can in fact serve as a basis for *per se* discrimination. *Bostock v. Clayton County*, 590 U.S. 644 (2020). Specifically, the Court held that "an employer cannot escape liability by demonstrating that it

treats males and females comparably as groups. As Manhart teaches, an employer is liable for intentionally requiring an individual female employee to pay more into a pension plan than a male counterpart even if the scheme promotes equality at the group level.  Likewise, an employer who intentionally fires an individual homosexual or transgender employee in part because of that individual's sex violates the law even if the employer is willing to subject all male and female homosexual or transgender employees to the same rule." *Bostock v. Clayton County*, 590 U.S. 644, 665 (2020).

There is no prohibition for the use of the "n word" in Verizon's Code of Conduct.  *See*, Exhibit 2 of Defendant's Memorandum of Law generally, and specifically page 9.  Instead, Verizon's Code of Conduct states only that "[O]ther forms of harassment may include racist comments, ethnic slurs, religious stereotypes, or homophobic jokes."  *See*, Exhibit 2 of Defendant's Memorandum of Law, generally, and page 9.  Verizon's Code of Conduct goes on to simply state that "[W]e do not tolerate such behavior."  *See* Exhibit 2 of Defendant's Memorandum of Law, generally, and page 10.

Despite this, the Defendant states that "the question before this Court here is not whether Plaintiff's particular use of the "N word" was comparatively less harmful than some other possible use of the "N word.""  *See*, Defendant's Memorandum of Law, page 2.  However, the EEOC does in fact perform that type of analysis is their guidance, where they state that "[H]arassment on the basis of race and/or color violates Title VII. Ethnic slurs, racial "jokes," offensive or derogatory comments, or other verbal or physical conduct based on an individual's race/color constitutes unlawful harassment ***if the conduct creates an intimidating, hostile, or offensive working environment or interferes with the individual's work performance***." EEOC

16

Guidance: Race Discrimination (https://www.eeoc.com/guidance/discrimination/race-discrimination/).

Further, the Defendant states that "[T]he answer here is that it unequivocally does not because Verizon treats all employees who use racial slurs the same, without regard to the speakers' race." *See*, Defendant's Memorandum of Law, page 2.  However, this too is incorrect since the Defendant admitted to treating employees differently for their use of racial slurs.  *See*, Joint Statement of Facts, paragraphs 27-29, and Exhibit 7 of Defendant's Memorandum of Law. Defendant claims that its' "consistent disciplinary practices regarding other employees who used the "N word" further undermines Plaintiff's *prima facie* case."  *See*, Defendant's Memorandum of Law, page 15.  However, this claim as to "consistent disciplinary practices" regarding the use of the "n word" is factually inaccurate since the Defendant has admitted to treating employees differently for their use of the "n word."  *See*, Joint Statement of Facts, paragraphs 27-29 and Exhibit 7 of Defendant's Memorandum of Law.

The Supreme Court has also defined what it means to discriminate against an individual when it stated, "the term "'discriminate against'" refers to "distinctions or differences in treatment that injure protected individuals." *Burlington N. & S. F. R.*, 548 U. S., at 59, 126 S. Ct. 2405, 165 L. Ed. 2d. 345. Firing employees because of a statutorily protected trait surely counts. Whether other policies and practices might or might not qualify as unlawful discrimination or find justifications under other provisions of Title VII are questions for future cases, not these." *Bostock v. Clayton County*, 590 U.S. 644, 681 (2020).  The use of the "n word" by an African American male to himself and about himself, amounts to "firing employees because of a statutorily protected trait" which, pursuant to the specific directives of the Supreme Court, is a violation of Title VII.  *See*, *Bostock v. Clayton County*, 590 U.S. 644, 681 (2020).

Further, firing an African American employee for the use of the "n word" when that employee uttered the word to himself and about himself, amounts to firing an employee for engaging in a statutorily protected behavior, the Plaintiff's right to free speech as guaranteed by both the United States Constitution and the Pennsylvania State Constitution. Finally, Defendant in alleging there is an (unwritten) "policy" requiring an African American employee to refrain from the use of a culturally significant word while at work is tantamount to requiring the African American employee to "code switch" while at work, which is a discriminatory practice because it requires the African American to refrain from a statutorily protected right, the right to free speech, while in the workplace. Verizon's human relations specialist, Ms. LaRusso, is unfamiliar with the term "code switching." *See*, Exhibit 3 of Defendant's Memorandum of Law in support of its' Motion for Summary Judgment, specifically page 51, lines 12-23. It is clear from the evidence presented by the Defendant, specifically the deposition testimony of its' employees, that no prohibition of the "n word" is provided for by the Defendant, and that instead, the Defendant twisted themselves inside out taking six (6) weeks to produce a justification for firing the Plaintiff. *See*, Exhibit 2 of Defendant's Memorandum of Law, Exhibit 3 of Defendant's Memorandum of Law, page 35, lines 14-25 and page 36, lines 1-3, and Exhibit 6 of Defendant's Memorandum of Law, page 71, lines 18-24 and page 72, lines 1-5.

The record provides proof the Plaintiff was fired solely for using the "n word." *See*, Joint Statement of Undisputed Facts, paragraph 25. The failure of the Defendant to have a clear policy relating to the use of one specific word that has different meanings depending on the speaker, clearly has a disparate impact upon a protected class of individuals, as shown by the Defendant's own Confidential data. Verizon's records show that there were eighteen individual Verizon employees in the Atlantic North region who were disciplined for the use of the "n word." *See*,

Exhibit 7 of Defendant's Memorandum of Law.  Of those individuals, four were Hispanic, two were White, one was Asian, one preferred not to answer and two identify as "two or more races." *See*, Exhibit 7 of Defendant's Memorandum of Law.  Assuming that two of the individuals who identified with two or more races do not identify as Black, 44% of the employees disciplined for the use of the "n word" are Black.  If either of the individuals who are identified as two or more races are also Black, then that number would increase to 50% and if both identify as Black, the number will increase to 55%.  The next highest percentage affected by the Verizon "policy" would be Hispanics at 22%.

Given the specific treatment received by the Plaintiff for his use of the "n word" by himself and to himself, and the refusal of the Defendant to review Plaintiff's speech in context, coupled with the information which the Defendant has produced for the Atlantic North region, it is undeniable that the actions of the Defendant in terminating employees for the use of the "n word" is disparate treatment of African Americans, who are indisputably members of a protected class and subject to protection pursuant to Title VII.  Clearly Verizon's "policy", which is not codified anywhere in the Defendant's Code of Conduct, while appearing neutral on its' face, disparately impacts a protected class of individuals identified as Black employees of Verizon.

### b.  Plaintiff's evidence supports a *prima facie* case for Retaliation.

The Defendant claims that the Plaintiff cannot make a *prima facie* case for Retaliation as the Plaintiff cannot show that he engaged in a "protected activity."  *See*, Defendant's Memorandum of law, page 16.  The Courts have held that "a plaintiff asserting a retaliation claim first must establish a prima facie case by showing "(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected

19

activity and the employer's adverse action. "Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 193 (3d Cir. 2015) (alteration in original) (quoting Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007))." *Stockton v. Green, Tweed & Co., Inc*., 2020 U.S. Dist. LEXIS 137364. The Court went on to state that "If the plaintiff makes these showings, the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action. Id. (citing Marra, 497 F.3d at 300)." *Id.* The Defendant claims that the Plaintiff "never engaged in "protected activity."" *See*, Defendant's Memorandum of Law, page 16. However, the Defendant ignores the June 7, 2023 meeting between Mr. Arena and the Plaintiff, where the Plaintiff lodged a complaint about the unfair and potentially discriminatory treatment by Ms. LaRusso and Mr. Arena. *See*, Exhibit 5 of Defendant's Memorandum of Law, page 5.

The Court has further defined what "opposition activity" means in this context when they stated, "For purposes of the first prong of a prima facie case of retaliation, protected 'opposition' activity includes not only an employee's filing of formal charges of discrimination against an employer but also informal protests of discriminatory employment practices, including making complaints to management." Id. (quoting Curay—Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006)) (additional citation omitted) **. . ..** "This standard requires an objectively reasonable belief' that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute." Id. at 193-94 (quoting Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 322 (3d Cir. 2008)). *Id*.

Plaintiff in addition to lodging a complaint with his supervisor, Mr. Arena, about being unfairly treated and discriminated against in his June 7, 2023 discussion with Mr. Arena, was also engaged in a free speech activity, protected by both the United States Constitution and the

Constitution of the Commonwealth of Pennsylvania.  While the Defendant claims that the Plaintiff "never complained of discrimination at any point during his employment," (*see*, Defendant's Memorandum of Law, page 16), the Plaintiff did on June 7, 2023 complain to Mr. Arena about his treatment by the Defendant.  *See*, Exhibit 5 of Defendant's Memorandum of Law, page 5.

Defendant claims that its' employees "investigated Plaintiff's use of the "N word.""  *See*, Defendant's Memorandum of Law, paragraph 21.  However, that "investigation" consisted of nothing more than determining that the word was spoken, not the context of the utterance, nor the impact the utterance had on any of Plaintiff's fellow employees.  *See* Exhibit 3 of Defendant's Memorandum of Law, page 23, lines 5-10.  The investigation took almost a month. *See*, Defendant's Memorandum of Law, Exhibit 3, page 56, lines 5-10.  The investigation included the Plaintiff lodging a complaint with Mr. Arena about discrimination on the part of the Defendant in concluding the Plaintiff was no longer eligible for a promotion.  This complaint was made to the Plaintiff as early as June 7th, 7 days after the incident.  *See*, Defendant's Memorandum of Law, Exhibit 5, page 5.

As a result of this complaint, the Defendant proceeded to investigate the Plaintiff only for the Plaintiff's use of the "n word."  *See* Exhibit 3 of Defendant's Memorandum of Law, page 22, lines 19-25, page 23, lines 5-10 and page 49, lines 1-25.  The facts indicate the Defendant's actions were taken in retaliation for the Plaintiff reporting that he felt the disciplinary actions were discriminatory.  *See*, Defendant's Memorandum of Law, Exhibit 5, page 5.  The fact that it took over twenty days from the date of this reporting for the team of Mr. Arena and Ms. LaRusso to come up with a justification for terminating the employment of the Plaintiff, (*see*, Exhibit 3 of Defendant's Memorandum of Law, page 33, lines 16-24, page 34, lines 1-3 and page 56, lines 5-

10), and the fact that after the decision was made, it took another two plus weeks for the termination to actually occur, (*see*, Joint Statement of Undisputed Facts, paragraph 25), <u>*all the while the Plaintiff was permitted to work unrestricted*</u>, supports Plaintiffs argument that he was fired in retaliation for reporting unfair and discriminatory treatment by the Defendant.

### c. Defendant did not terminate the employment of the Plaintiff for a legitimate, non-discriminatory, non-retaliatory reason.

The Defendant claims that their reason for terminating the employment of the Plaintiff is "legitimate, non-discriminatory, and non-retaliatory." *See*, Defendant's Memorandum of Law, page 17. Defendant also argues that "Verizon terminated Plaintiff for using the "N word" in violation of Verizon's Code of Conduct." *See*, Defendant's Memorandum of Law, page 17. However, it is unclear whether Defendant was fired for violating the Defendant's Code of Conduct when the Code of Conduct contains no prohibition for using the "N word" in the specific language of the Code of Conduct itself. *See*, subsection (a) above. Further, there is likewise no definition of nor preclusion from using a "racial slur" in the Defendant's Code of Conduct. *See*, subsection (a) above. As such, there is clearly a material issue as to whether the Plaintiff was terminated in violation of a purported policy of the Defendant, when that purported policy is not specified in the Defendant's Code of Conduct.

### d. The record provides evidence that Defendant's alleged reason for terminating the Plaintiff's was pretextual.

The Defendant claims that the Plaintiff is unable to show that the Defendant's purported reason for terminating the Plaintiff's employment was pretextual, and argues that Plaintiff has "put forth no evidence from which a factfinder could disbelieve that Verizon terminated Plaintiff for using the "N word" or believe that a discriminatory reason was more likely than not the

reason for his termination," Defendant contends this defeats the Plaintiff's claim that the facts and circumstances surrounding Mr. Murray's termination are pretextual. *See*, Defendant's Memorandum of Law, page 18. However, the Third Circuit Court of Appeals has considered how pretextual arguments are reviewed. The Third Circuit has a rigorous standard for pretextual arguments in discrimination cases, which is clearly defined by the Court's holding in *Fuentes v. Perskie*, 32 F.3d 759 (1994).

The standard set forth by the *Fuentes* Court requires that in order to survive a Motion for Summary Judgment, the Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," *Ezold*, 983 F.2d at 531, and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons." 8 *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993) (internal quotation omitted); *see id.* at 638 (holding that the proper inquiry is whether the plaintiff has proffered sufficient evidence of "inconsistencies and implausibilities in the employer's proffered reasons"); *Ezold*, 983 F.2d at 527." *Fuentes v. Perskie*, 32 F.3d 759, 765 (1994).

First, we ask the Court to consider the fact that the Code of Conduct does not preclude the use of the "n word" itself, yet testimony from Kevin Arena and Brittany LaRusso, the two Caucasian individuals who made the decision to terminate the employment of the Plaintiff for the use of the "n word" repeatedly stated that the sole reason for firing the Plaintiff was his use of the "n word". *See*, Joint Statement of Undisputed Facts, paragraph 25, and Exhibit 3 of Defendant's Memorandum of Law, page 22, lines 19-25, page 23, lines 5-10 and page 49, lines 1-25. Also, the Verizon Code of Conduct does not mandate an employee be terminated for a

23

violation of its' vague harassment rules. *See*, Exhibit 2 of Defendant's Memorandum of Law, pages 9-10. Additionally, there is evidence of disparate treatment between the Plaintiff and Alex who were both involved in the altercation on June 1, 2023. The disparate treatment of Alec and the Plaintiff is also a material fact which needs to be resolved by the trier of fact, including but not limited to the investigation conducted by Verizon and how it reached the decision to terminate the employment of the Plaintiff.

The Defendant's own data which they demanded be marked and utilized as confidential, admits that their treatment of employee's from the Atlantic North Region who have utilized the "n word" has varied from termination to written warnings. *See*, paragraph 56 of Defendant's Memorandum of Law, paragraphs 27-29 and Exhibit 7 of Defendant's Memorandum of Law.[2] The variation in discipline is an additional illustration for what appears to be a similar offense cited for the termination of the Plaintiff and the disparate treatment given to Alec, who fully engaged in the altercation which was the initial focus of the investigation, and which only upon the Plaintiff's June 7, 2023 discussion with Mr. Arena changed to a review of whether or not the Plaintiff had violated an unwritten policy of the Defendant. The Plaintiff has clearly set forth numerous issues of material fact upon which the trier of fact could reject the Defendant's argument in support of its' termination of the employment of the Plaintiff and find that the stated reason for the termination of the Plaintiff's employment was a pretext for the actual discriminatory and retaliatory actions of the Defendant.

---

[2] The mere fact that the Defendant chose to provide only data from the Atlantic North region in response to the discovery request which demanded all information from the Defendant, without identification as to this restriction in data until the preparation of the Joint Statement of Undisputed Facts, serves as a material issue as it is unknown whether or not any of the Defendant's other regions have comparator information that would be relevant to the instant matter.

**C.        Plaintiff has established a claim for wrongful termination.**

The Defendant argues that Plaintiff will be unable to establish a claim for wrongful termination.  However, Plaintiff's Partial Motion for Summary Judgment, which is incorporated herein, clearly establishes a claim for wrongful termination because the Defendant punished the Plaintiff for exercising his constitutionally protected right of free speech.  The Plaintiff's utterance of the "n" word to himself while referring to himself is a constitutionally protected form of speech, and the Defendant's termination of the Plaintiff's employment solely on the basis of that exercise, is a clear violation of the public policy mandate that protects the Plaintiff's right to free speech which is not otherwise prohibited by the Defendant.  S*ee*, Joint Statement of Undisputed Facts, paragraph 25. Considering the facts and applicable law cited by Plaintiff, he has clearly met his burden of proof supporting the claim for Wrongful Termination.

**IV.    CONCLUSION**

For the reasons presented above, and as more specifically pled in Plaintiff's Partial Motion for Summary Judgment, the Plaintiff, Devon Murray, respectfully requests that this Honorable Court deny the Defendant's Motion for Summary Judgment in the form of the proposed Order which is included with this response.

Respectfully submitted,

**PAX LEGAL, INC.**

Dated:  August 28, 2025

By: _____

Lida L. Bonner, Esq.
Neil M. Hilkert, Esq.
***Counsel for Plaintiff,***
Devon Murray

25